The facts relevant to the controversy and the questions presented for decision are very well stated in the brief of counsel for appellant as follows:
"This is a case involving the constitutionality of the act of the General Assembly of North Carolina of 1909, ch. 442, authorizing the establishment of levee or drainage districts; of the validity of bounds which the commissioners of a drainage district, purporting to have been established under the act, have contracted to issue; and also of the action of the commissioners in letting the contract for the construction (740) of the work to one who was not the lowest bidder, in view of the provision of the statute requiring the contract to be let to the `lowest responsible bidder.'
"Under the statute a petition for the establishment of a drainage district in Currituck County was presented to the clerk of the Superior Court, and after proceedings duly taken was declared to be established as the Moyock District, No. 1. The plaintiff herein is a citizen, taxpayer and landowner within the boundaries of the district, and his lands have been assessed for the costs of the improvements to be made, under the classification of the lands embraced in the district according to the provisions of the statutes. The plaintiff has brought this suit *Page 707 
to restrain the commissioners of the drainage district from issuing bonds contracted for to defray the costs and expenses of the proposed improvements.
"Upon the case being brought to a hearing it was adjudged by the court below that the act of 1909, ch. 442, is valid and that the proceedings of the commissioners were regular, and that the plaintiff was not entitled to the injunction prayed for. An appeal was taken and has been duly perfected.
"The following propositions, involving the constitutionality of the statute and the validity of the bonds, and also the action of the commissioners in letting the contract, are submitted to the Court:
"1. Conferring upon the clerk of the Superior Court the power to establish a levee or drainage district is invalid as constituting a delegation of legislative power and duty to the judiciary.
"2. The statute shows upon its face that it is for the benefit of private landowners and not for a public purpose.
"3. As a levee or drainage district is a quasi-municipal corporation, and the work is not a `necessary expense,' within the meaning of Art. VII, sec. 7, of the Constitution of North Carolina, a debt cannot be contracted `unless by a vote of the majority of the qualified voters therein.'
"4. The contract should have been let to the lowest bidder in this case or the work should have been advertised for new bids.
"The foregoing propositions, so far as they involve the validity of the statute, are pointed to the provisions of the State and the United States Constitutions, declaring that the legislative, executive and supreme judicial powers of the Government ought to be forever separate and distinct from each other; that no person ought to be deprived of his property but by the law of the land or by due process of law; and that no municipal corporation shall contract any debt except for the necessary expenses thereof, unless by a vote of the majority of (741) the qualified voters therein."
after stating the case: The power of the Legislature to create special taxing districts for public purposes, separate and distinct from the ordinary political subdivisions of the State, such as counties, townships, etc., was declared and approved in Smith v. School Trustees, 141 N.C. 143, and like power to create special assessment districts have been upheld by the Court in several well-considered decisions. Asheville v. Trust Co.,143 N.C. 360; Busbee v. Commissioners, *Page 708 93 N.C. 143; Commissioners v. Commissioners, 92 N.C. 180; Shuford v.Commissioners, 86 N.C. 552; Newsome v. Earnheart, 86 N.C. 391; Cain v.Commissioners, 86 N.C. 8.
The principle has been frequently extended and applied to the creation of these drainage districts, and while certain statutes may have been declared void, this as a rule was because the rights of persons affected had not been in some way sufficiently safeguarded; and, so far as we have examined, the power of the General Assembly to enact legislation of this character has not been successfully questioned. Adams v. Joyner,147 N.C. 77; Porter v. Armstrong, 139 N.C. 179; Pool v. Trexler,76 N.C. 297; Norfleet v. Cromwell, 70 N.C. 634; Fall Brook v. Bradley,164 U.S. 112; Warts v. Hoagland, 114 U.S. 606; Land Co. v. Miller,170 Mo., 240; Morrison v. Morey, 146 Mo., 543; Drainage District v.Mastin Co., 144 Cal. 209; Cribbs v. Benedict, 64 Kans., 555;Bryant v. Robbins, 70 Wis. 258.
Speaking to such legislation, and the reasons upon which it may be made to rest, Rodman, J., delivering the opinion in Norfleet v. Cromwell, supra, said:
"The defendant takes higher ground, and contends that the act of 1795 was unconstitutional, because it took his property for a mere privatepurpose. It is admitted that that cannot be lawfully done, and the only question on this point is as to the character of the purpose: whether it was to the benefit of one or of a limited number of individuals only, or of such general and public utility as justifies a State in the exercise of its power of eminent domain.
"It is well known that in the Atlantic section of this State there are hundreds of thousands of acres of what are called swamp lands, which from the flatness of their surface and the filling up of the natural (742) courses of drainage, if any ever existed, cannot be relieved of the water which ordinarily covers them, and made fit for human habitation and cultivation, except by cutting artificial canals from them into some convenient creek or river, which must necessarily pass through the intervening lands of the riparian proprietors. If these canals can be cut only by permission of the owners of the banks of the necessary outlets, this vast area of fertile land must remain for ages an uncultivated and unpopulated wilderness, and it will be entirely valueless to those who bought it from the State on the faith of its laws. An act which aims to remedy so great an evil, affecting so many persons now living, and so many more in the future, must be deemed one of general and public utility. In an agricultural view, it now benefits the whole population of that part of the State in which these swamps are found.
"The right of the State to condemn lands for drains rests on the same foundation as its right in cases of public roads, mills, railroads, *Page 709 
cartways, schoolhouses, forts, lighthouses, etc. In the case of public roads, it has never been doubted, and the weight of authority is decidedly in favor of its existence for the other purposes mentioned. Roads and aqueducts are classed together in the Institutes as servitudes of the same public character. In the swamps which the act in question chiefly affects, the canals are more important than the roads, as they must always precede them. The right to drain through the banks of a natural watercourse is exactly similar in character to the right to construct dykes or levees to keep their excessive waters from overflowing the adjacent lands, a right which has been recognized in the legislation of all countries from the most ancient times. Witness the dykes which protect the coast of Holland, the fens of Lincolnshire, the lands on the Mississippi and on the Potomac. Both purposes are classed together in our act of 1789.
"The act in question, and others of a like character respecting mills, etc., are of ancient date. They have been incidentally sanctioned by this Court in many decisions, and if their constitutionality has never been directly affirmed, it may be because it was never questioned. These acts are not peculiar to North Carolina. Acts concerning mills, similar to ours, exist in many of the States (Washburn Easements, 394 [329]), and respecting drainage, at least, in Massachusetts (Gen. Stat., ch. 148) and New York (2 Rev. St., 548; People v. Nearing, 27 N.Y. [13 Smith], 306)."
The legislation in question here comes well within the principle established by these cases. It has evidently been prepared with great care, and seems to present a scheme for the drainage of these (743) lowlands at once comprehensive, adequate and efficient, and in which the rights of all persons to be affected have been fully considered and protected.
When these drainage districts are created under statutes like this we are now considering, they are regarded as public quasi-corporations, partaking to some extent of the character of a governmental agency, and for general purposes of taxation in the ordinary acceptation of the term they come, as a rule, within the restrictions established by the Constitution upon municipal corporations in reference to the imposition of taxes both as to the amount and method. Smith v. Trustees, supra; but under our decisions these restrictive provisions as to taxation have been held not to apply to the case of local assessments, where, as in this case, such assessments are made and collected by some recognized method apportioning the burdens according to the benefits received by the property affected. Busbee v.Commissioners, supra, Commissioners v. Commissioners, supra; Shuford v.Commissioners, supra; Newsome v. Earnheart, supra; Cain v. Commissioners,supra. *Page 710 
In Shuford's case it was held:
"1. A tax levied only upon land under the provisions of the `stock law' (Laws 1879, ch. 135) is not within the constitutional prohibition as to uniformity of taxation, and hence the assent of the qualified voters of the district affected is not necessary; and this, even though the act of the Legislature styles it a tax.
"2. It is regarded as a local assessment, and made, with reference to special benefits derived from the property assessed, from the expenditure; while taxes are public burdens, imposed as burdens, for the purpose or general revenue."
And in Commissioners v. Commissioners, 92 N.C. supra, Chief JusticeSmith, on this subject, quotes with approval from the opinion in Cain v.Commissioners, as follows:
"As the greater burden is thus removed from the landowner he, as such, ought to bear the expense by which this result is brought about. The special interest benefited by the law is charged with the payment of the sum necessary in securing the benefit. This and no more is what the statute proposes to do, and in this respect is obnoxious to no just objection from the taxed land proprietor, as it is free from any constitutionalimpediments."
The objection urged, therefore, that no vote of the people on the proposition was required or provided for by the statute, must be overruled.
Nor can the further objection be sustained that the act in question improperly undertakes to confer legislative power and duties on (744) the clerk of the court, a judicial officer; for, on authority, the duties and powers conferred on the clerk by this statute are of a judicial nature.
Speaking to this question, in 10 A. E., at page 239, it is said: "The better doctrine, however, seems to be that the duties of the municipal authorities in determining the necessity for sewers (dependent on a like principle), their location and their general plan, are of a judicial orquasi-judicial nature, while the work of construction and maintenance is ministerial." And authoritative decisions fully support the position as stated. Johnston v. District of Columbia, 118 U.S. 19; Callen v. City,43 Kans., 627; Bellingham Imp. Co. v. City, 20 Wn. 53; Wahoo v. Dickenson,23 Neb. 426. This disposes, we believe, of the objections urged against the validity of the statute.
It was further contended for plaintiff that, under the provisions of the law, the commissioners had no right to accept and award the contract to a higher bidder, but that "the contract should have been let to the lowest bidder, or the work should have been advertised for new bids"; but the language of the statute is that "They, together with the *Page 711 
superintendent of construction, shall convene and let to the lowestresponsible bidder"; and the decisions are to the effect that when, by the clear import of this or similar language, a discretion is conferred, the action of the authorities will not be interfered with, unless the same was influenced or procured by fraud. People v. Kent, 160 Ill. 655; Brick andPav. Co. v. Philadelphia, 164 Pa. St., 477; Commonwealth v. Mitchell, 82 Pa. St., 343; Clapton v. Taylor, 49 Mo. App. 117.
In People v. Kent it was held:
"1. The word `responsible,' applied to an undertaking to pay money only, means financial ability; but in the statute for letting contracts for public improvements, which requires a `responsible bidder,' it has the wider meaning of ability to respond to the requirements of the contract, having full regard to the subject-matter thereof.
"2. The requirement of a statute, that contracts for a public improvement shall be let to the lowest responsible bidder, does not require the letting of a contract to the lowest bidder upon the ascertainment of his financial responsibility only, but the term `responsible' includes the ability to respond by the discharge of the contractor's obligations in accordance with what may be expected or demanded under the terms of the contract.
"3. The courts cannot interfere, in the absence of fraud, with the exercise of the official discretion of a public officer entrusted with the duty of awarding a contract, in determining whether a certain person was the lowest responsible bidder, after investigation of such (745) person's record in doing similar business before."
And in Clapton v. Taylor, supra:
"2. In letting contracts for street improvements the duty of city authorities is not wholly ministerial, but partakes sufficiently of a judicial character, in the absence of fraud or misconduct, to render their conclusion binding; and the law in regard to the letting of such contracts does not mean absolutely that the contract shall be given to the lowest bidder without regard to fitness, and the city authorities are presumed to have done, and not to have exceeded, their duty."
The case was submitted for our decision near the close of the term, with a request that an early decision be rendered, and we may have written somewhat hurriedly. Our investigations, however, have been very much facilitated by the excellent briefs submitted by counsel for both parties, and we desire to express appreciation of the commendable diligence they have shown in their preparation, and the great aid these briefs have been to the Court in reaching a satisfactory conclusion on the questions presented.
For the reasons stated, we are of opinion that the judgment of his Honor below must be
Affirmed. *Page 712 
 Cited: White v. Lane, 153 N.C. 17; Forehand v. Taylor, 155 N.C. 355;Trustees v. Webb, ib, 386; Carter v. Comrs., 156 N.C. 187; Comrs. v. Webb,160 N.C. 595; In re Drainage District, 162 N.C. 128; Newly v. DrainageDistrict, 163 N.C. 26; Shelton v. White, ib., 92; Drainage Comrs. v. FarmAsso., 165 N.C. 700; Lang v. Development Co., 169 N.C. 664; Drainage Comrs.v. Mitchell, 170 N.C. 325; Leary v. Comrs., 172 N.C. 25; Canal Co. v.Whitley, ib., 161.